UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD DONALD BURLEY,

        Plaintiff,

Case No. 1:13-cv-599

Hon. Robert J. Jonker

v.

DAVID LESLIE and G. BALL,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendants Leslie and Ball's motion for summary judgment (docket no. 15).

**I.    Plaintiff's claims**

Plaintiff, Edward Burley, filed an amended complaint naming two defendants, Chaplain David Leslie and Assistant Deputy Warden Gary Ball. Amend. Compl. at ¶ III. At all relevant times, defendants were employed by the Michigan Department of Corrections (MDOC) at the Richard A. Handlon Correctional Facility (MTU). *Id.* Plaintiff is suing defendants in both their official and individual capacities. *Id.* Plaintiff's amended complaint set forth the following allegations. On November 1, 2010, plaintiff declared his religious preference as "Judaism." Compl. at ¶ 1. After being denied access to a kosher diet on December 30, 2010, plaintiff was eventually recommended for the diet on December 12, 2011 and allowed to participate in the diet in March 2012. *Id.* at ¶¶ 2-11. According to plaintiff, Chaplain Leslie did not provide him with "any means" to eat a kosher diet. *Id.* at ¶ 11. While incarcerated at MTU, plaintiff attempted to obtain an

itinerary to Jewish services, obtain access to a Torah, "access to Passover," "access to Jewish Literature," and "placement of a Torah in the visitation area so plaintiff could share his newly found faith with his family and friends." *Id.* at ¶ 12.

However, from April 2011 through January 2012, Chaplain Leslie denied plaintiff access to Jewish Services "while other Jewish prisoners were permitted to attend Friday Night Jewish Services." *Id.* at ¶ 13. Specifically, from April 2011 through December 2011, Chaplain Leslie either denied or refused to acknowledge plaintiff's requests to attend services. *Id.* at ¶ 14. Chaplain Leslie also denied plaintiff's "access to Passover" and no foods were available to plaintiff that were marked "Kosher for Passover." *Id.* at ¶¶ 16-17. Plaintiff pointed out that Chaplain Leslie did not required "Islamic prisoners" to be tested before being considered for a religious diet and that such prisoners, along with "non-Muslims" are allowed to participate in Ramadan. *Id.* at ¶ 18.

Chaplain Leslie also failed to provide plaintiff with a Torah and Jewish Literature, even though plaintiff was indigent. *Id.* at ¶ 19. According to plaintiff, Chaplain Leslie did not provide these books to plaintiff even though the Chaplain kept "numerous editions" of the Bible, Qurans and "other religious holy books for prisoners." *Id.* The Chaplain refused to acquire a Torah and Jewish Literature for plaintiff, which "denied Plaintiff that opportunity other prisoners were afforded, i.e., the ability to share his faith with his family and friends." *Id.* at ¶ 21. Chaplain Leslie asked plaintiff not to grieve the matter, but plaintiff responded by filing "grievance #MTU111101205020a." *Id.* at ¶ 23.

Plaintiff claims that Chaplain Leslie retaliated against him by the following acts (in his words):

> 25. Leslie retaliated against Plaintiff by purposely not taking actions to rectify his requests for services and a Torah, and making matters worse after plaintiff

>   grieved Leslie by transferring him to a place where the Kosher Diet was not available.
>
>   26. Leslie made remarks indicating that his refusal or untimeliness was the result of the grievances, requests for investigation by the MDOC ombudsman, plaintiff involving his family and attempting to involve the outside Jewish community for assistance in observing his religious tenets. See Exhibit B.
>
>   27. That Defendant retaliated against Plaintiff by not permitting him to attend services, receive any Jewish Literature, and by ignoring Plaintiff's request for Passover, Kosher Diet, inter alia.

*Id.* at ¶¶ 25-27. Notably, plaintiff's complaint does not include any allegation of wrongdoing against defendant ADW Ball.

Plaintiff alleged defendants' acts violated his right to freely exercise his religion, violated his equal protection rights and retaliated against him in violation of the First and Fourteenth Amendments. *Id.* at p. 4. Plaintiff also alleged that defendants violated his rights under the Religious Land and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc (RLUIPA), 42 U.S.C. § 1983, and that defendants committed state torts of "conspiracy and intentional infliction of mental and emotional distress." *Id.* at pp. 4 and 9. Plaintiff seeks an injunction "ordering the MDOC not [to] transfer or continue [to] retaliate against Plaintiff for exercising a protected activity," and damages in excess of $600,000.00. *Id.*

## II.   Defendants' motion for summary judgment

### A.   Legal standard

Defendants seek summary judgment on both claims. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Exhaustion

#### 1. Exhaustion requirement

Defendants contend that plaintiff failed to properly exhaust his claims. The Prison Litigation Reform Act of 1996 ("PLRA") provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532

U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not

5

receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Plaintiff failed to properly exhaust his claim

#### a. Plaintiff's grievances

Defendants point out that plaintiff appealed five grievances through Step III while incarcerated at MTU. *See* Richard Russell Affidavit and attachment (docket no. 16-3). Only one of these grievances, Grievance No. MTU-11-11-1205-20a ("1205") addressed the issues raised in the amended complaint. Specifically, Grievance No. 1205 stated that Chaplain Leslie and MTU impeded plaintiff's exercise of his religious beliefs as guaranteed by the First Amendment. *See* Grievance No. 1205 (docket no. 16-4). Despite plaintiff's requests, the Chaplain refused to provide the indigent plaintiff with a Torah, refused to arrange for Jewish Services, refused to make arrangements for plaintiff to be transferred to a facility with Jewish Services, refused plaintiff's request "to partake in Kosher Meals," and interfered with plaintiff's access to a Rabbi. *Id.* The grievance was denied at Steps I, II and III. *Id.* Finally, the grievance did not allege and wrongdoing on behalf of ADW Ball, whose only connection with plaintiff's claim is that he responded to the Step I grievance directed at Chaplain Leslie. *Id.* Plaintiff relies on this grievance in support of his claims. *See* Amend. Compl. at ¶ 23.

#### b. Chaplain Leslie

Grievance No. 1205 is directed solely at Chaplain Leslie for an alleged violation of plaintiff's First Amendment to practice his religion because the Chaplain: refused to provide the

indigent plaintiff with a Torah; refused to arrange for plaintiff to attend Jewish Services; refused to make arrangements for plaintiff to be transferred to a facility with Jewish Services; refused plaintiff's request "to partake in Kosher Meals;" and interfered with plaintiff's access to a Rabbi. Based on this record, plaintiff has properly exhausted these five claims against Chaplain Leslie. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. However, because Grievance No. 1205 does not address any claim of retaliation, any claim of a RLUIPA violation, or the commission of any state law torts, he has failed to properly exhaust these claims. *Id.* Accordingly, Chaplain Leslie is entitled to summary judgment with respect to all claims except for plaintiff's claims that he was denied the free exercise of his religion under the First Amendment.

        **c.    ADW Ball**

Grievance no. 1205 neither names ADW Ball nor grieves any action taken by Ball against plaintiff. For this reason, plaintiff has failed to properly exhaust a grievance against ADW Ball. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Furthermore, plaintiff's amended complaint does not allege that ADW Ball did anything. ADW Ball's only involvement was as the Step I respondent to plaintiff's grievance. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the actual denial of a request to receive medical care). Accordingly, ADW Ball's motion for summary judgment should be granted.

### C. First Amendment claims against Chaplain Leslie

### 1. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, plaintiff alleged that defendants violated his First Amendment rights by interfering with the exercise of his religious beliefs. The First Amendment provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948). This limitation of privileges arises "both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security." *Id.* citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). Evaluation of penological

objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution under examination. *Id.* at 349. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* As the court stated in *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972), "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."

### 2. Kosher meals

Plaintiff alleged that Chaplain Leslie refused to allow him to partake in Kosher Meals. Policy Directive 05.03.150 regulates a prisoner's ability to request a religious menu, providing in pertinent part:

> A prisoner may eat from a religious menu only with approval of the CFA Special Activities Coordinator. Approval shall be granted only if it is necessary to the practice of the prisoner's designated religion. To request approval, the prisoner must submit a written request to the Warden, TRV Manager, or designee, as appropriate, who shall obtain information regarding the prisoner's request and religious beliefs prior to referring the request to the CFA Special Activities Coordinator. The CFA Special Activities Coordinator shall notify the Warden, TRV Manager or designee, as appropriate, of the decision; the Warden or TRV Manager shall ensure that the prisoner is notified. A prisoner whose request is denied shall not be allowed to submit another request to eat from that religious menu for at least one year.

Policy Directive 05.03.150 ¶ SS.

In his affidavit, Chaplain Leslie stated that MTU does not provide Kosher meals:

> The only Jewish prisoners who routinely attended on Friday service callouts were those seeking a Kosher meal designation and I would use that time to process kosher meal requests. Because MTU does not provide Kosher meals, prisoners

> approved to eat from the Kosher meal diet were then routinely transferred to a facility which offered Kosher meals.

Chaplain Leslie Aff. at ¶ 6 (docket no. 17-3 at pp. 2-7); CFA Facilities which offer Kosher Meal program (docket no. 17-3 at p. 21). Chaplain Leslie's also pointed out that while he may make a recommendation regarding a prisoner's request to eat from a religious menu, he "do[es] not have the authority to approve or deny such a request" under Policy Directive 05.03.150 ¶ SS. *Id.* at ¶ 18. Because Chaplain Leslie was not authorized to approve plaintiff's request for Kosher meals, plaintiff cannot hold the Chaplain liable for failing to provide those meals. *See* Policy Directive 05.03.150 ¶ SS ("[a] prisoner may eat from a religious menu only with approval of the CFA Special Activities Coordinator"). Accordingly, Chaplain Leslie's motion for summary judgment should be granted on this claim.

### 3. Jewish group religious services

Plaintiff alleged that Chaplain Leslie refused to arrange for plaintiff to attend Jewish Services. As an initial matter, Chaplain Leslie observed that "[n]owhere in his Complaint does Burley allege that his faith requires him to pray in a group setting." Defendants' Brief at p. 10 (docket no. 16). The Court does not view this particular omission as barring plaintiff's claim. While prison inmates do not forfeit their constitutional right to freely exercise their religion, their exercise is subject to limitations. *See O'Lone*, 482 U.S at 348-49. The state has the ability to regulate group religious services within its correctional facilities. *See, e.g., Colvin v. Caruso*, 605 F.3d 282, 291 (6th Cir. 2010) ("[t]his court has consistently permitted prisons to take into account the level of inmate interest in a particular religion when determining whether to hold services"); *Spies v. Voinovich*, 173 F.3d 398, 404-05 (6th Cir. 1999) (holding that the MDOC's "group-of-five rule" requiring that five documented members of a faith be interested in forming a faith group before such

a group can be formed, is reasonably related to legitimate penological interests and constitutionally valid under the test set forth in *Turner v. Safley*, 482 U.S. 78 (1987)).

Here, MTU acknowledged that Jewish prisoners were entitled to participate in group services by scheduling Jewish group services as authorized by MDOC Policy Directive 05.03.150 ¶ X, which provides in pertinent part that:

> Group religious services shall be offered at all institutions for prisoners belonging to a recognized religious group. Except as set forth in Attachment A, each group shall be allowed a weekly religious service if resources permit; however, a service is not required to be conducted if there are less than five prisoners within the same security level of that institution who actively participate in the religious activities of a group. . .

Chaplain Leslie explained the MTU group services as follows:

> 5. During the time period in question, MTU did have a time slot, Fridays 1950 to 2045, for Jewish services. By policy, 05.03.150, "Religious Beliefs and Practices of Prisoners", group services are reserved for groups of five or more prisoners within the same security level who actively participate in the religious activities. (Attachment #1 at ¶ X).
>
> 6. The only Jewish prisoners who routinely attended on Friday service callouts were those seeking a Kosher meal designation and I would use that time to process kosher meal requests. Because MTU does not provide Kosher meals, prisoners approved to eat from the Kosher meal diet were then routinely transferred to a facility which offered Kosher meals. (Attachment #2).
>
> 7. At MTU there was no outside volunteer to lead the Friday Jewish service and none of the prisoners who attended were willing to lead the service, even on a temporary basis. It appeared to me that Jewish prisoners had lost interest in the group service because nothing was happening and they weren't learning anything. Unfortunately, it was not unusual that less than five prisoners would attend Jewish services.
>
> 8. Even when less than five prisoners attended, my normal practice was to allow them to stay and read their religious materials as I processed Kosher meal requests.

11

Chaplain Leslie Aff. at ¶¶ 5-8. MTU could have restricted the First Amendment rights of Jewish prisoners by not allowing group services. However, by allowing Jewish group services at MTU, the prison officials acknowledged Jewish prisoners, like plaintiff, had a First Amendment right to attend those scheduled services.

In his affidavit, Chaplain Leslie states that plaintiff's allegation "that I denied him the ability to participate in Jewish services" is false. *Id.* at ¶ 4. In his counter-affidavit, plaintiff stated that at "various and diverse times" he asked Chaplain Leslie for access to Jewish Friday night services, but he was "continually denied access" for nearly one year. Burley Aff. at ¶ 4 (docket no. 20-2). Plaintiff has also submitted the declaration of prisoner Danny Smith who states that he observed plaintiff "fill out more than one kite" requesting attendance at Jewish services. *See* Smith Decl. (docket no. 20-2 at p. 6). Plaintiff stated that he was allowed two call outs to attend Friday night services during the last two weeks of his confinement at MTU. Burley Aff. at ¶ 4. At that time, "[plaintiff] and the fellow Jewish prisoners would sit at a table directly in front of Chaplain Leslie's office and discuss the Torah." *Id.* Viewing this record in the light most favorable to the nonmoving party (plaintiff), a genuine issue of material fact exists as to whether Chaplain Leslie violated plaintiff's First Amendment rights by denying him access to Jewish group religious services as those services were conducted at MTU. Accordingly, Chaplain Leslie's motion for summary judgment should be denied on this claim.

### 4. Access to a Torah and/or Jewish literature

Plaintiff, an indigent, alleged that Chaplain Leslie refused to provide him with a Torah and Jewish literature. Chaplain Leslie addressed these claims in his affidavit as follows:

      10.     In his Amended Complaint at paragraph 3, Burley also alleges that I refused to provide him with Jewish literature, including a Torah. These allegations are false.

      11.     MTU does have reading/educational materials for Jewish prisoners, including over 20 hours of videos donated by the Aleph Institute, prayer books and reference books such as The Zohar, which is a 22 volume set of Jewish teaching.

      12.     Although Burley saw the video tapes when he looked through the Jewish literature, he never requested to view the tapes.

      13.     Despite his claim as to a lack of Jewish reading materials, Burley did indicate to me in a letter that he was reading "a few" books on Judaism that he obtained from the prison library and that his parents were also sending him some books and literature. (Attachment #3).

      14.     In addition, Burley could have also written a request to the Prisoner Benefit Fund to purchase literature for Jewish prisoners. (Attachment #4, MDOC Policy Directive 04.02.110, "Prisoner Benefit Fund" at ¶ E(1)).

      15.     I was able to acquire a Torah from Special Activities Coordinator, Chaplain Michael Martin, which I loaned to Burley.

      16.     Despite being loaned the Torah, once Burley was approved for the Kosher menu and transferred from MTU, I learned that he had taken the Torah with him.

Chaplain Leslie Aff. at ¶¶ 10-16.

      In his affidavit, plaintiff states that he was denied access to "Jewish Literature," but does not define what he considers to be such literature nor does he address the literature available at MTU identified by Chaplain Leslie. *See* Burley Aff. at ¶¶ 7-8. The only "Jewish Literature" explicitly referenced in plaintiff's affidavit is the Torah, with plaintiff stating that Chaplain Leslie "denied access to a Torah." *Id.* at ¶ 7. Plaintiff's claim, however, is meritless, given that he admits that Chaplain Leslie provided him with a Torah after an MDOC Ombudsman requested a copy on behalf of plaintiff, and "[a]t no time did Defendant Leslie inform me *that the Torah he gave me was on loan.*" *Id.* at ¶¶ 7-8 (emphasis added).

13

Furthermore, the Ombudsman's letter makes it clear to plaintiff that Chaplain Leslie did not have a duty to fulfill his request for specific religious reading material:

> Per Policy Directive 05.03.150 paragraph HH, "Institutional chaplains shall ensure that religious reading material from a variety of religious groups is available for prisoner use." Nowhere in the MDOC policy on religious reading materials is it mandated for a correctional facility to provide specific religious reading material such as a Torah for prisoners. The reading materials provided by the institution is left up to the discretion of the institutional chaplain as laid out in the before mentioned PD.
>
> However, at your request I contacted MDOC staff about providing a Torah for inmates housed at MTU. I was informed that MDOC staff would take steps to fine a synagogue or organization willing to donate a Torah to the facility. I do not have an exact time frame on how long that this process will take. If a Torah has not be provided within the next 6 months, you are welcome to contact our office again on this subject.

Ombudsman Letter (docket no. 20-4 at p. 1). *See also, Colvin*, 605 F.3d at 292 (prisoner could not establish a violation of his right to practice Judaism where Jewish books were available to prisoners and prisoner access to religious material was not unduly restricted). Accordingly, Chaplain Leslie is entitled to summary judgment on this claim.[1]

### D. Immunity

#### 1. Eleventh Amendment Immunity

Plaintiff has sued defendants in both their individual and official capacities. Defendants seek dismissal of plaintiffs' claims to the extent that plaintiffs seek monetary damages against defendants in their official capacities. Plaintiff's § 1983 claims for monetary damages against the defendants in their official capacities are barred by Eleventh Amendment immunity. *See Will v. Department of State Police*, 491 U.S. 58, 64-71 (1989); *Rodgers v. Banks*, 344 F.3d 587, 594

---

[1] The Court notes that while plaintiff's Grievance No. 1205 complained that Chaplain Leslie interfered with plaintiff's access to a Rabbi and refused to make arrangements for plaintiff to be transferred to a facility with Jewish Services, plaintiff did not include these claims in his amended complaint.

(6th Cir. 2003) ("the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities"). Accordingly, defendants are entitled to summary judgment with respect to plaintiffs' § 1983 claims for monetary damages in their official capacity.

### 2. Qualified Immunity

Finally, Chaplain Leslie contends that he is entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 231-33 (2009); *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011). The court may exercise its sound discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Chaplain Leslie contends that he is entitled to qualified immunity because he did not violate plaintiff's First Amendment rights. As discussed, *supra*, the Court has concluded otherwise. Accordingly, Chaplain Leslie's motion for summary judgment on this ground should be denied.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 15) be **GRANTED** as to all claims alleged against ADW Ball and that he be dismissed from this action.

I further recommend that defendants' motion for summary judgment (docket no. 15) be **GRANTED** as to all claims alleged against Chaplain Leslie **EXCEPT** plaintiff's claim that Chaplain Leslie violated plaintiff's First Amendment rights by denying him access to Jewish group services at MTU.

Dated:  August 18, 2014                                    /s/ Hugh W. Brenneman, Jr.
                                                                        HUGH W. BRENNEMAN, JR.
                                                                        United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).